UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| BARJA, INC. AND FRY'S FREEWAY INVESTMENT, INC., <br><br>Plaintiffs, <br><br>v. <br><br>EQUILON ENTERPRISES, LLC, AND DOES 1 THROUGH 10, inclusive <br><br>Defendants. | CASE NO. CV10-06936 ODW (PLAx) <br><br> ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [27] |

## I. INTRODUCTION

Currently before the Court is Defendant Equilon Enterprises, LLC d/b/a Shell Oil Products, U.S.'s ("Defendant" or "Equilon"), Motion for Summary Judgment. (Dkt. No. 27.) The Court held oral argument on June 20, 2011. After careful consideration of the briefing and evidence submitted by the parties in support of and in opposition to the instant Motion, the Court **GRANTS** Defendant's Motion for the following reasons.

## II. UNDISPUTED FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Barja, Inc. ("Barja") operates a Shell-branded service station located at 11944 West Olympic Boulevard, Los Angeles, California, 90064 (the "Olympic Station") pursuant to a Retail Facility Lease and Retail Sales Agreement with Equilon. (Dkt. No. 78, Exhs. 6-7, Statement of Undisputed Facts ("SUF") No. 1.) Equilon still owns the real property on which the Olympic Station is located. (SUF No. 1.) Plaintiff Fry's 710 Freeway Investment Inc. ("Fry's") operates and now owns a Shell-branded service station located at 5201 Imperial Highway, South Gate, California, 90280 (the "Imperial Station"). (SUF No. 2.) Fry's purchased the real property from Equilon pursuant to its Right of First Refusal ("ROFR") offer Equilon presented for the Imperial Station. (SUF No. 2.)

In 2005, Equilon made the strategic business decision to withdraw from the retail gasoline market, sell its retail assets, and convert to a wholesale marketing strategy. (SUF No. 3.) As part of its national strategy, Equilon devised a multi-step "portfolio process" to be followed in each market and closely followed this process in the Los Angeles market. (SUF No. 4.) One of Equilon's first steps in the divestment process was to hold meetings during the summer of 2008 with individual station operators in the Los Angeles region. (SUF No. 5.) After these meetings, Equilon gave dealers, such as Plaintiffs, the opportunity to purchase their stations before the sites were made available to third party buyers. (SUF No. 6.) Barja ultimately elected not to submit the Offer to Equilon. (SUF No. 7.) Because Barja did not submit the Offer to Purchase Premises to Equilon, the Olympic Station was marketed through commercial real estate broker CB Richard Ellis, which received several letters of intent for the purchase of the Olympic Station, at prices as high as $4.5 million. (SUF No. 8.)

In response to Equilon's offer to purchase the property prior to making the site available to third party buyers, Fry's made an offer to purchase the Imperial Station for $1.7 million in 2008. (SUF No. 9.) The sale never consummated, however, because Fry's was unable to close escrow. As a result, Fry's remained as a tenant at the site. (SUF No. 9.)

In 2009, Equilon invited a number of parties to participate in a two-step bid process for the purchase of all or portions of the retail assets in the Los Angeles market. (SUF No. 10.) As part of its overall divestment in the Los Angeles market, Equilon broke up its assets into four separate groups of gasoline service stations or "clusters." (SUF No. 59.) Each cluster contained stations that conducted business in one of three different classes of trade including: (1) stations owned and operated by "open dealers," to whom Equilon only supplied fuel and did not own or lease the real estate; (2) stations operated pursuant to third party leases, where Equilon did not own the land, but leased it from a third party landlord and then subleased it to a dealer/franchisee, and to whom Equilon supplied fuel; and (3) "fee properties," where Equilon owned the land and leased it to the dealer/franchisee, and supplied fuel to the site. (SUF No. 60.) Accordingly, bidders were bidding on Equilon's right, title and interest in real estate, and certain contracts, including real estate leases, service station leases and retail supply agreements that they would be acquiring as part of the sale. (SUF No. 72.)

In response to its bid invitations, Equilon received several first round bids. (SUF No. 11.) Equilon invited a selection of the first round bidders to submit subsequent second round bids. (SUF No. 12.) Four bidders submitted second round bids for Cluster 3, the portion of the Los Angeles market that included the Olympic Station, and four bidders submitted second rounds bids for Cluster 4, which included the Imperial Station. (SUF Nos. 13-14.)

Apro Distribution, LLC ("Apro") submitted a second round bid for Clusters 3 and 4 on or about August 27, 2009. (SUF No. 15.) The bids included a specific purchase price offered for Equilon's interest in each property. (SUF No. 16.) Apro was eventually selected to be the preferred bidder to purchase Clusters 3 and 4 after bidding was completed in September 2009. (SUF No. 17.) Upon further negotiations, Apro agreed to revise its cash consideration for Equilon's assets to include an additional $1.3 million and 20 million gallons of annual fuel sales to Equilon from its original offer. (SUF No. 20.) Equilon instructed Apro to allocate the additional $1.3 million among

the assets it agreed to purchase without specific instruction as to how the amount should be distributed among the gas stations in the clusters. (SUF No. 21-22.) Thereafter, Equilon received new purchase prices from Apro for the Olympic and Imperial Stations. (SUF No. 23.)

In early June 2010, Equilon and Apro executed separate Offers to Purchase Premises and Addenda to Offer to Purchase Premises (the "Third Party Offers") for Apro's purchase of the Olympic Station in the amount of $3,737,414.00 and for the purchase of the Imperial Station for $600,000.00. (SUF No. 24.) In allocating value to the individual gas stations in each cluster, Apro assumed certain values for a number of factors, including transportation costs, volume projections, margin, fuel distribution costs, overhead, rent, expenses, exclusivity, volume, potential, contract term, proximity to other stations, likelihood of contract renewal by the existing dealer, and environmental considerations. (SUF No. 84.) On June 10, 2010, an escrow account was opened for the Imperial and Olympic Stations. (SUF No. 25.) The next day, Apro made deposits into the escrow account indicating a willingness to close on the Third Party Offers. (SUF Nos. 26, 38.)

On or about June 21, 2010, Equilon sent Plaintiffs their respective ROFR's based on Apro's Third Party Offers to purchase the Olympic and Imperial Stations. (*See* SUF Nos. 27-28.) Plaintiffs accepted their ROFR "under protest" on July 16, 2010. (SUF No. 29-30). On February 24, 2011, Fry's closed escrow on its purchase of the Imperial Station for $600,000.00, the price specified on Apro's Third Party Offer and Fry's ROFR. (SUF No. 31.) Fry's no longer challenges the purchase price of the Imperial Stations contained in its ROFR. (SUF No. 32.)

Based on these facts, Plaintiffs instituted this action on August 20, 2010 at the Los Angeles County Superior Court alleging that Equilon violated Cal. Bus. & Prof. Code § 20999.25 ("§ 20999.25") and Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("Unfair Competition Laws" or "UCL"). (Dkt No. 1.) In addition, Plaintiffs seek declaratory and injunctive relief and damages. On September 27, 2010, Equilon removed this action to

4

this Court. At this time, Equilon seeks summary judgment as to all of Plaintiffs' claims.

**III.     LEGAL STANDARD**

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Evidence the court may consider includes the pleadings, discovery and disclosure materials, and any affidavits on file. Fed. R. Civ. P. 56(c)(2).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp v. Catrett*, 477 U.S. 317, 323-24 (1986). That burden may be met by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and identify specific facts that show a genuine issue for trial. *Id*. at 323-34; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968). Summary judgment is appropriate if a party, after adequate time for discovery, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp v. Catrett*, 477 U.S. at 322.

Only genuine disputes over facts that might affect the outcome of the suit will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248; *see also Aprin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) (the nonmoving party must present specific evidence from which a reasonable jury could return a verdict in its favor). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000).

It is not the task of the district court "to scour the record in search of a genuine issue of triable fact. [Courts] rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also Carmen v. San Francisco Unified Sch. Dist.*, 237

F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.").

## IV. DISCUSSION[1]

Equilon contends that Plaintiffs' § 20999.25 and UCL claims along with Plaintiffs' request for Declaratory Relief fail as a matter of law. The crux of Equilon's argument is that the ROFR's presented to Plaintiffs were in accordance to § 20999.25 as they were based on bona fide Third Party Offers. The Court addresses Equilon's arguments to the extent necessary.

### A. CALIFORNIA BUS. & PROF. CODE § 20999.25

Generally, the Petroleum Marketing Practices Act ("PMPA") covers the business relationship between franchisors and franchisees in the petroleum industry. *See* 15 U.S.C. §§ 2801-06; *see also Atlantic Richfield Co. v. Herbert (In re Herbert)*, 806 F.2d 889, 892 (9th Cir. 1986) ("In enacting the PMPA, Congress attempted to provide national uniformity of petroleum franchise termination law."). The PMPA applies when a franchise is terminated or not renewed. 15 U.S.C. § 2806(a); *Forty-Niner Truck Plaza, Inc. v. Union Oil Co. Of Cal., et al.*, 58 Cal. App. 4th 1261, 1266 (Ct. App. 1997). The PMPA, however, does not cover a situation where the franchise continues, such as when a franchisor assigns its obligations to another. 15 U.S.C. § 2806 (b)(1); *Forty-Niner*, 58 Cal .App. 4th at 1275.

In California, "[§ 20999.25(a) was enacted to] facilitate[] the purchase of retail service stations by their independent lessee-franchisees in contexts outside franchise termination and nonrenewal . . . ." *Forty-Niner*, 58 Cal. App. 4th at 1273. Accordingly, § 20999.25(a) allows a petroleum marketing franchisee, typically a service station operator, a bona fide opportunity to buy the station if the petroleum marketing franchisor, typically an oil company, is going to sell it to another. *Id*. Specifically, under §

---

[1] To the extent this Order references any of the materials, we grant the parties' requests for judicial notice. *See* Fed. R. Evid. 201(b) (establishing that judicial notice is appropriate for facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

20999.25(a), a franchisor, like Equilon, who wants to sell service station premises that it owns and leases to franchisees, such as Plaintiffs, may either: (1) make a "bona fide offer" to sell its interest in the premises to the franchisee; or (2) give the franchisee "a ROFR of any bona fide offer acceptable to the franchisor made by another to purchase the franchisor's interest in the premises." While recognizing that the PMPA is instructive, *see Unocal Corp. v. Kaabipour, et al.*, 177 F.3d 755, 769 (9th Cir. 1999) (*citing Forty-Niner*, 58 Cal. App. 4th at 1273) ("[Section 20999.25(a)] parallels the PMPA in 'seek[ing] to protect the franchisee's reasonable expectation of continuing its business while allowing the franchisor adequate flexibility to respond to changing market conditions.'"), the parties in this case do not dispute that § 20999.25(a) controls because the context in this case is outside franchise termination and nonrenewal. Accordingly, the parties' main contentions lie in whether Equilon's ROFR's presented to Plaintiffs for the Olympic and Imperial stations were based on bona fide Third Party Offers and whether the ROFR's and Apro's Third Party Offers were materially different.

### 1. **Apro's Third Party Offers for the Olympic and Imperial Stations**

Equilon moves this Court to find that it presented Barja and Fry's with ROFR's based on bona fide offers to purchase the Olympic and Imperial Stations. Particularly, Equilon contends that the valuations of the Stations were apparent, and that Equilon did not manipulate the values that would render Apro's Third Party Offers a sham.

In determining whether an offer is bona fide, Courts have ruled that a bona fide offer approaches fair market value under an objectively reasonable analysis. *Forty-Niner*, 58 Cal. App. 4th at 1281 (citations omitted). The objective reasonableness test does not measure whether the franchisor's offer was actually at fair market value but rather, whether the offer approached fair market value. *Anand v. BP West Coast Prods., LLC*, 484 F. Supp. 2d, 1086, 1096 (C.D. Cal. 2007) (citations omitted). Accordingly, the fair market value of any one property is a flexible concept and a range of prices may have a reasonable claim to being fair market value. *Id.* (citations and quotations omitted). The *Forty-Niner* case provides guidance as to this analysis.

To begin, fair market value, by definition, is the highest price a willing buyer would pay. *Forty-Niner*, 58 Cal. App. 4th at 1282. This is especially true because "[a]n actual price, agreed to by a willing buyer and a willing seller, is the most accurate gauge of the value the market places on a good." *Id.* Here, the parties do not dispute that Apro's Third Party Offers consisted of $3,737,414.00 for the Olympic Station and $600,000.00 for the Imperial Station. In addition, Apro made earnest money payments in escrow for these stations. Thus, it cannot be disputed that these amounts were actual prices that a willing buyer, Apro, was willing to pay to a willing seller, Equilon. (Mot. at 12.)

Next, a bona fide offer includes the sale of pumps, dispensers, storage tanks, piping and other equipment necessary for the continued operation of a service station. *Forty-Niner*, 58 Cal. App. 4th at 1282. In this case, the ROFR explicitly provides for such purchases and other equipment necessary for the continued operation of a service station. (Mot. at 13.) This fact is undisputed.

Plaintiffs, nevertheless, contends that Apro's bids on the Olympic and Imperial Stations were bundled with multiple other sites and multiple other rights that had not been offered to Plaintiffs. (Opp'n at 14.) For example, Plaintiffs aver that in addition to acquiring the right to buy real estate, equipment, and improvements, the successful bidder of a cluster, like Apro, would also buy the right to supply all of the stations in that cluster with Shell-branded fuel. (Opp'n at 9.) Thus, Plaintiffs argue that Apro was bidding on Equilon's right, title and interest in real estate and certain contracts, including real estate leases, service station leases and retail supply agreements. (Opp'n at 10.) In sum, Plaintiffs contend that these rights and interests that go beyond the Olympic and Imperial Stations inflate Apro's Third Party Offers. Consequently, Plaintiffs contend that Apro's initial bulk valuation of the clusters to which the values of the Olympic and Imperial Stations depend, render Apro's Third Party Offers inaccurate and questionable, thereby creating disputable issues of fact as to whether Apro's offers were, indeed, bona fide. (Opp'n 13-14.)

California law, however, recognizes that parties to a purchase transaction involving many sites can allocate a portion of the total purchase price to a single site to allow another party to exercise a right of first refusal on the single site. *Forty-Niner*, 58 Cal. App. 4th at 1279. When the valuation of individual properties is (1) readily apparent and (2) there is no evidence of unfair manipulation, a right of first refusal is sufficient. *Id.* at 1280 (citation omitted). The parties, here, do not dispute that Apro's Third Party Offers consisted of $3,737,414.00 for the Olympic Station and $600,000.00 for the Imperial Station. The valuation of the individual properties, therefore, are readily apparent.

Likewise, Equilon contends and the Court agrees that there is no evidence of unfair manipulation to render the ROFR's, and their underlying Third Party Offers, invalid. A prospective third party buyer of several stations, like Apro, may have preexisting or planned commercial relationships that give it certain advantages in acquiring a franchise on a particular site. *Id.* In addition, a prospective buyer who does not currently have a franchise would come to the table with different needs than a prospective buyer who already has a franchise and is currently leasing a facility for sale. *BP West Coast Prods. v. Greene*, 318 F. Supp. 2d 987, 999 (E.D. Cal. 2008) (quoting *Keener v. Exxon Co., U.S.A.*, 32 F.3d 127, 132 (4th Cir. 1994) ("[B]idders routinely come to the table with different hands."). This does not make that third party's offer less bona fide so long as that offer is an actual one that approaches fair market value under an objectively reasonable analysis. *Forty-Niner*, 58 Cal. App. 4th at 1282.

In this case, the evidence shows that Apro valued the Olympic and Imperial Stations through its own efforts based on reasonable factors including the estimate of the land's value and expected performance of the sites. (Mot. at 10.) The Third Party Offers were based on these valuations. Plaintiffs simply do not offer evidence showing that Equilon deliberately manipulated or inflated Apro's valuations to Plaintiffs' disadvantage. Indeed, the fact that Fry's, who has since closed on its purchase of the Imperial Station, does not challenge the propriety of Apro's valuation supports Equilon's contention. (Mot. at 10-11.) Equilon ultimately has shown that Apro's Third

Party Offers are actual and approach fair market value. Therefore, Apro's Third Party Offers to which ROFR's are based were bona fide offers.

## 2. The Terms and Conditions of Equilon's ROFR's to Plaintiffs

Plaintiffs aver that because they were not offered the same exact terms and conditions as the purchase agreement between Equilon and Apro, the ROFR's did not comport with § 20999.25(a). (Opp'n at 14.) Particularly, Plaintiffs point to the fuel distribution rights to an entire marketing area in Los Angeles offered to Apro. (Opp'n at 14.) In addition, Plaintiffs argue that the Apro's third party offer is a sham because Apro and Equilon will actually enter into a different agreement if Plaintiffs reject the ROFR's. (Opp'n at 14-15.) On the contrary, Equilon contends that courts generally do not look to the individual terms and conditions as part of the reasonableness inquiry, but rather, confine their analysis to whether there is a willing buyer and seller at an actual price.

While Plaintiffs detail certain differences in the agreements between Apro and Equilon and Apro's Third Party Offers for the Olympic and Imperial Stations, § 20999.25(a) does not require third party offers to franchisees to mirror purchase agreements offered to third party purchasers. *See BP West Coast Prods.*, 318 F. Supp. 2d at 999. Common sense dictates that an offer to a franchisee oftentimes cannot be in exact arrangement as those terms offered to a third party purchaser. In this case, for example, Equilon offered Apro a purchasing agreement that included, among other things, minimum annual gallon requirements for a region of gas stations. (Reply at 4.) Surely, such conditions cannot be forced upon a franchisee of a single gas station.

In addition, the fact that the purchasing agreement between Apro and Equilon included terms and condition not offered to Plaintiffs are of no consequence where Apro's offer for the Olympic and Imperial Station are severable. *See Arnold v. Amoco Oil Co.*, 872 F. Supp. 1493, 1500 (W.D. Va. 1995) ("The sale and purchase agreement was written so that the purchase of the [franchisee's] stations could be severed from the agreement, a necessary precaution since [franchisor] had yet to offer Arnold the stations

as required by the PMPA. As such, the other obligations between [third party purchaser] and [franchisor], such as the supply agreement, were not necessarily part of the specific offer for [franchisee's] stations."). Indeed, provisions regarding Plaintiffs' Stations are wholly apart and separate to the rest of the purchasing agreement between Apro and Equilon. (*See* Reply at 6-7.) Moreover, there is no evidence that the part of Apro's offer to Equilon that pertained to the Olympic and Imperial Stations differed in any material way from Equilon's ROFR's to Plaintiffs. *See Arnold*, 872 F. Supp. at 1500.

Still, Plaintiffs contend that Equilon has failed to offer its entire interest as part of the ROFR's. (Opp'n at 16-19.) Plaintiffs also argue that the ROFR's contain several "commercially unreasonable" terms and conditions that set each Plaintiffs' ability to close escrow up for failure from the start of the transaction. (Opp'n at 19.) Plaintiffs, therefore, aver that triable issues of fact remain as to the ROFR's reasonableness. (Opp'n at 20.)

First, franchisors are not required to offer 100% of its interest in a gas station to the franchisee to make a "bona fide" offer. *Anand*, 484 F. Supp. 2d at 1098. Rather, the law requires only that the franchisor's offer enable the franchisee "to continue operating [her] facility as a service station if [she] exercise[s][her] right to buy." *Id*. (citation omitted). Specifically, "the PMPA does not mandate that a franchisor's offer include rights to subterranean minerals beneath the station premises, however, and does not prevent the franchisor from inserting reasonable environmental covenants and conditions in the sales agreement, so long as the covenants and restrictions do not prevent the franchisee from continuing to operate her facility as a service station." *Id*. (citations and quotations omitted). As Plaintiffs contend, the ROFR's, indeed, contain restrictions that: are environmental in nature related to groundwater supply; related to the maintenance of existing structures on the premises; and require continued commercial use of the premises. (Opp'n at 17.) Plaintiffs, however, do not show that these restrictions in any way limit their ability to continue operating their facilities as service stations. Without such limitations, Plaintiffs' contentions fail.

Next, Plaintiffs argue that deed restrictions contained in the ROFR are unreasonable because: (1) the restrictions will necessarily encumber the title to the properties; (2) will negatively affect their value and marketability; (3) prevent future re-development of the property for anything but commercial purposes; and (4) hinder Plaintiffs' ability to secure a commercial loan for the purchase of properties. (Opp'n at 19.) As Equilon points out, however, this Court previously rejected similar arguments indicating that terms included and accepted by a third party, and as a result, included in the ROFR to a franchisee cannot be found to be unreasonable. (Mot. at 19.) In addition, this Court's inquiry does not go beyond determining that an agreed upon actual price between a willing buyer and seller exists because that is the most accurate gauge of the value the market places on a good. *BP West Coast Prods.*, 318 F. Supp. 2d at 1002 (citing *Keener*, 32 F.3d at 132) ("Until [there is an agreed upon price by a willing buyer and seller], the market value of an item is necessarily speculative.") The franchisee, therefore, only has the right to match the terms of the contract between the franchisor and the prospective buyer. *Id.* (citation omitted). While parties certainly have the right to negotiate further terms, franchisees generally cannot move the court to evaluate the reasonableness of terms to which third parties have accepted. Accordingly, and in this instance, the Court refrains from second guessing each and every term included in Apro's Third Party Offers and the ROFR's. *See id.*

Thus, Plaintiffs' ROFR's for the purchase of the Olympic and Imperial Stations did not violate § 20999.25(a). The Court, therefore, **GRANTS** Equilon's Motion as to this claim.

### B. REMAINING CLAIMS

Because the Court finds that Equilon did not violate § 20999.25(a), Plaintiffs' UCL claim and request for declaratory relief also fail. Specifically, the UCL defines unfair competition as "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [Cal. Bus. & Prof. Code §§ 17500 *et seq*.]." Therefore, in order to state a claim for unfair competition under

the UCL, a plaintiff must allege either: (1) an unlawful act; (2) an unfair act; (3) a fraudulent act; or (4) false advertising. As discussed above, Equilon adhered to the statutory requirements of § 20999.25(a). Hence, Equilon did not commit any unlawful, unfair, or fraudulent act nor are there any allegations directed to false advertising. Accordingly, the Court **GRANTS** Equilon's Motion as to this claim.

Likewise, Plaintiffs' request for declaratory relief must fail because such relief must be based on a cognizable legal theory. No cognizable legal theory survives, and as a result, the Court **GRANTS** Equilon's Motion as to this request.

## V. CONCLUSION

For the foregoing reasons, Equilon's Motion for Summary Judgment is **GRANTED** in its entirety. Plaintiffs' claims are dismissed with prejudice. The Clerk of Court shall close this case.

IT IS SO ORDERED.

July 7, 2011

_____
HON. OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE